_____ FILED _____ LODGED
_____ RECEIVED _____ COPY

AUG 2 6 2014

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

SEALED

In the Matter of the Search of:

SUBJECT PARCEL: Shanghai, China, International Express, EMS parcel bearing tracking number: EE 932984402 CN, addressed to: "Monte, 1601 W Apache Trail Apace Junction, Arizona, 85120, United States" with a return address of "Marry, Shanghai, China". Bearing the company name, "Shanghai Jifeng." It is a brown construction paper bundle, wrapped in clear cellophane shrink wrap, measuring approximately 10" X 7.5", X 5", weighing approximately 5 lbs. The SUBJECT PARCEL is postmarked July 30, 2014 from SHA-441

Case No.: 14-379 MB

**ORDER TO SEAL**

**(Filed Under Seal)**

Based upon the United States of America's Motion to Seal, and good cause appearing,

**IT IS ORDERED** that the United States' *Application and Affidavit for Search Warrant*, the United States' *Motion to Seal,* and this *Order* be filed under seal and shall remain under seal until *further Order of the Court*.

**IT IS HEREBY ORDERED** that excludable delay under 18 U.S.C. § 3161(h) is found to commence from _____ through _____.

Dated this _20th_ day of _August_, 2014.

_____
HONORABLE MICHELLE H. BURNS
UNITED STATES MAGISTRATE JUDGE

___ FILED        ___ LODGED
___ RECEIVED     ___ COPY

AUG 2 6 2014

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

JOHN S. LEONARDO
United States Attorney
District of Arizona

DONALD J. PASHAYAN
Assistant U.S. Attorney
Ohio State Bar No. 0071260
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
E-mail: Don.Pashayan@usdoj.gov

SEALED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

In the Matter of the Search of:

SUBJECT PARCEL: Shanghai, China, International Express, EMS parcel bearing tracking number: EE 932984402 CN, addressed to: "Monte, 1601 W Apache Trail Apace Junction, Arizona, 85120, United States" with a return address of "Marry, Shanghai, China". Bearing the company name, "Shanghai Jifeng." It is a brown construction paper bundle, wrapped in clear cellophane shrink wrap, measuring approximately 10" X 7.5", X 5", weighing approximately 5 lbs. The SUBJECT PARCEL is postmarked July 30, 2014 from SHA-441

Case No.: 14-379 MB

**GOVERNMENT'S MOTION TO SEAL**
**(Filed Under Seal)**

The United States of America moves this Court for an Order sealing (1) the United States' search warrant application and affidavit in support and (2) this motion to seal and resulting order. Disclosure would reveal the existence of, and details concerning, an ongoing investigation and may lead to the destruction of evidence and/or flight by the subjects of the investigation.

Excludable delay under 18 U.S.C. § 3161(h) is not expected to occur as a result of

//

//

1   this motion and an order based thereon.

2       Respectfully submitted this _20th_ day of August, 2014.

3

4                                   JOHN S. LEONARDO
                                    United States Attorney
5                                   District of Arizona

6

7                                   DONALD J. PASHAYAN
                                    Assistant U.S. Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

_____ FILED _____ LODGED
_____ RECEIVED _____ COPY

AUG 2 6 2014

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

_____ District of Arizona _____

*In the Matter of the Search of:*

*(Name, address or brief description of person or property to be searched)*

**SUBJECT PARCEL**: Shanghai, China, International Express, EMS parcel bearing tracking number: EE 932984402 CN, addressed to: "Monte, 1601 W Apache Trail Apace Junction, Arizona, 85120, United States" with a return address of "Marry, Shanghai, China". Bearing the company name, "Shanghai Jifeng." It is a brown construction paper bundle, wrapped in clear cellophane shrink wrap, measuring approximately 10" X 7.5", X 5", weighing approximately 5 lbs. The SUBJECT PARCEL is postmarked July 30, 2014 from SHA-441.

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

Case Number:

14-379 M SEALED

I, JEFFREY C. AGSTER, being duly sworn depose and say:

I am a(n) U. S. POSTAL INSPECTOR and have reason to believe that ☐ on the person of or ☒ on the premises known as:

**SUBJECT PARCEL**: Shanghai, China, International Express, EMS parcel bearing tracking number: EE 932984402 CN, addressed to: "Monte, 1601 W Apache Trail Apace Junction, Arizona, 85120, United States" with a return address of "Marry, Shanghai, China". Bearing the company name, "Shanghai Jifeng." It is a brown construction paper bundle, wrapped in clear cellophane shrink wrap, measuring approximately 10" X 7.5", X 5", weighing approximately 5 lbs. The SUBJECT PARCEL is postmarked July 30, 2014 from SHA-441.

In the District of Arizona there is now concealed a certain person or property, namely, (describe the person or property)
CONTROLLED SUBSTANCE ANALOGUES AND/OR U. S. CURRENCY OR DOCUMENTS RELATING TO THE DISTRIBUTION OF CONTROLLED SUBSTANCES ANALOGUES
which is (give alleged grounds for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)
CONTRABAND, THE FRUITS OF CRIME, OR THINGS OTHERWISE CRIMINALLY POSSESSED

in violation of Title(s) 21, United States Code, Section(s) 841(a)(1), 802(32), 813, 843(b), and 846. The facts to support the issuance of a Search Warrant are as follows:

SEE ATTACHED AFFIDAVIT OF JEFFREY C. AGSTER, WHICH IS MADE A PART HEREOF.

Continued on the attached sheet and made a part hereof.
  X   Yes   ___   No
Authorized by AUSA  D. J. PASHAYAN

_____
Signature of Affiant – JEFFREY C. AGSTER

Sworn to before me, and subscribed in my presence

Date  aug. 20, 2014          at      Phoenix, Arizona
                                      City and State

HONORABLE MICHELLE H. BURNS           _____
UNITED STATES MAGISTRATE JUDGE         Signature of Judicial Officer
Name and Title of Judicial Officer

# A F F I D A V I T

I, Jeffrey C. Agster, being duly sworn, hereby depose and say:

1.   I am a United States Postal Inspector and have been so employed since February 2004.  I have completed a twelve-week basic training course in Potomac, Maryland, which included training in the investigation of narcotics trafficking via the United States Mail.   I am currently assigned to the Phoenix Division, specifically to the Prohibited Mailings Narcotics Team (PMN) in Arizona, which is responsible for investigating narcotic violations involving the United States Mails.   My responsibilities include the detection and prevention of the transportation of controlled substances through the U.S. Mail.  Part of my training as a Postal Inspector included narcotic investigative techniques, chemical field-testing, and the training in the identification and detection of controlled substances being transported in the U.S. Mail.

2.   I have been the lead agent on numerous narcotics investigations and have conducted arrests of individuals for violations of Title 21, United States Code, Sections 841(a) (1), Possession with intent to Distribute a Controlled Substance, and 843(b), Unlawful use of a Communication Facility to facilitate the commission of a Federal Drug Felony.

3.   This affidavit is made in support of an application for a search warrant for one (1) Shanghai, China, International Express Mail Service ("EMS") parcel, hereinafter referred to as the "**SUBJECT PARCEL.**"  The **SUBJECT PARCEL** is believed to contain controlled substance analogues.

1

4.    The **SUBJECT PARCEL** is described as follows:

a)  Shanghai, China, International Express, EMS parcel bearing tracking number: EE 932984402 CN, addressed to: "Monte, 1601 W Apache Trail Apace Junction, Arizona, 85120, United States" with a return address of "Marry, Shanghai, China". Bearing the company name, "Shanghai Jifeng." It is a brown construction paper bundle, wrapped in clear cellophane shrink wrap, measuring approximately 10" X 7.5", X 5", weighing approximately 5 lbs. The **SUBJECT PARCEL** is postmarked July 30, 2014 from SHA-441.

## THE CONTROLLED SUBSTANCE ANALOGUE ENFORCEMENT ACT OF 1986

5.  I have spoken with Drug Enforcement Administration Special Agent Kenneth C. Henry about the **SUBJECT PARCEL** and about controlled substance analogue investigations. SA Henry advised me that he has conducted a number of investigations, prosecutions, and even a trial related to the manufacture and distribution of controlled substance analogues, to include the prosecution of *United States v. Michael Rocky Lane, et al.,* Case No. 12-CR-1419-PHX-DGC(LOA). As a result of his participation in that investigation and prosecution, SA Henry advised me, in substance, of the following:

2

## A. The Analogue Act

1.      In 1986, Congress amended the Controlled Substances Act,

21 U.S.C. 801-971, by establishing federal prohibitions against drug trafficking in

"controlled substance analogues." Enacted as part of the Anti-Drug Abuse Act of

1986, the Controlled Substance Analogue Enforcement Act of 1986, (CSAEA or

Analogue Act) was designed to address "underground chemists who tinker with

the molecular structure of controlled substances to create new drugs that are not

scheduled." Such new drugs are referred to as controlled substance "analogues."

2. Prior to the CSAEA, unlawful conduct with regard to drug

trafficking was tied to "precise chemical definitions," and "law enforcement

authorities had long found themselves at least one step behind drug dealers who

possess certain rudimentary scientific abilities." New designer drugs are often

created as alternatives to known illegal drugs precisely because they may be sold

with an appearance of legality. Unable to keep its controlled substance schedules

current in the face of accelerating innovations in drug technology, Congress

enacted the Analogue Act to target distribution of just such substances. *United

States v. Hodge, 321 F.3d 429.* The Analogue Act does not specifically list the

chemicals and substances that are controlled substance analogues. "The very

purpose of the statute, which is to prevent development of new drugs by

underground chemists attempting to create new drugs that are not scheduled,

necessitates some elasticity and prevents a specific listing of chemical analogues."
*United States v. Klecker, 348 F.3d 69 (4th Cir. 2003).*

      3.  Under the CSAEA, a controlled substance analogue is a

substance:

          a. the chemical structure of which is substantially similar to the chemical structure of a controlled substance in Schedule I or II;

          b. which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in Schedule I or II; or

          c. with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic

4

effect on the central nervous system of a controlled substance in Schedule I or II.

4. The "intended for human consumption" requirement is an essential element of the offense. Accordingly, prosecutors must prove beyond a reasonable doubt that the substance in question is a controlled substance analogue, and that the analogue was intended for human consumption.

## B.    "Bath Salts" and synthetic cathinones

1. On October 21, 2011, the Administrator of the Drug Enforcement Administration issued a final order to temporarily schedule three synthetic cathinones under the Controlled Substances Act (CSA), pursuant to the temporary scheduling provisions of 21 USC 811 (h). These substances are Mephedrone (4-methyl-N-methylcathinone), Methylone (3, 4-methyleneledioxy-N-methylcath-inone), and MDPV (3, 4-methylenedioxypyrovalerone). This action was based on a finding by the Administrator that the placement of these synthetic cathinones and their salts, isomers, and salts of isomers into Schedule I of the CSA is necessary to avoid an imminent hazard to public safety. As a result of this order, the full effect of the CSA and its implementing regulations including criminal, civil and administrative penalties, sanctions and regulatory controls of Schedule I substances, will be imposed on the manufacture, distribution, possession, importation, and exportation of these synthetic cathinones.

5

2.  "Bath salts," aka "novelty powders" are slang terms used herein

to describe synthetic powders, which contain synthetic cathinones.  "Bath salts"

are central nervous system stimulants that have no real value as a bath salt or other

bath product.  Through the course of the Lane investigation mentioned above, SA

Henry learned that companies located in China and India are principally

responsible for manufacturing and exporting the chemicals utilized by clandestine

manufacturers to produce "bath salts."  The only known purpose of these types of

"bath salts" is to be consumed as a recreational drug.  "Bath salts" first emerged in

the United States circa 2010 and were used as recreational drugs.  The drug is

typically snorted in powder form or ingested in pill form, but it can also be

smoked or injected intravenously.  While its effects may vary, users typically

experience highs similar to that of the drug Ecstasy, as well as stimulants such as

cocaine and methamphetamine.  Investigation to date has found that companies

intentionally mislabel the "bath salt" products to evade detection by law

enforcement, and sell it via the internet to distributors around the world, including

in the United States.  "Bath salts" are labeled "not for human consumption" in an

effort    to    circumvent    federal    and    state    narcotics    laws.    U.S.

manufacturers/distributors  then  sell  the  drug  online,  through  traditional

distribution methods, or by retail distribution at convenience stores, gas stations,

and head shops. These "bath salts" are labeled as carpet deodorizers, glass

cleaners, ladybug attractant, and spa therapies, to name a few.  Despite the "not for

human consumption" warnings on the packages, distributors/retailers market these

"bath salts" as recreational drugs specifically for human consumption. "Bath salt" powders are typically sold in half-gram or 1-gram quantities, and cost approximately $24.00 for a half gram and $35.00 for a gram.

## C.        Synthetic cannabinoids and "spice"

1. On March 01, 2011, the Administrator of the Drug Enforcement Administration issued a final order to temporarily schedule five synthetic cannabinoids into Schedule I under the Controlled Substances Act (CSA), pursuant to the temporary scheduling provisions of 21 USC 811 (h).  These substances are JWH-018 (1-pentyl-3-(1-naphthoyl)indole), JWH-073 (1-Butyl-3-(1-napthoyl)indole),     JWH-200     [1-[2-(4-morpholinyl)ethyl]-1H-indol-3-yl]-1-naphthalenyl-methanone,   CP-47,   497   (2[(1S,3R)-3-hydroxycyclohexyl]-5-(2-methyloctan-2-yl)phenol), and cannabicyclohexanol (CP-47, 497 C8 Homologue). On July 9, 2012, the President of the United States signed the Synthetic Drug Abuse Prevention Act of 2012 and scheduled fifteen (15) synthetic cannabinoids as Schedule I Controlled Substances to include JWH-018 and AM2201 [1-(5-Fluoropentyl)-3-(1-naphthoyl)indole ].  On May 16, 2013, the Administrator of the Drug Enforcement Administration issued a final order to temporarily schedule three synthetic cannabinoids into Schedule I under the Controlled Substances Act (CSA) pursuant to the temporary scheduling provisions of 21 USC 811 (h).  These substances are UR-144 (1-pentyl-1H-indol-3-yl), 5-fluoro-UR-144 (aka XLR11) [1-(5-fluoro-pentyl)-1H-indol-3-yl],  and  AKB48  [N-(1-adamantyl1)-1-pentyl1-1H-indazole-3-carboxamide].  On February 10, 2014, the Deputy Administrator of

7

the Drug Enforcement Administration issued a final order to temporarily schedule four synthetic cannabinoids into Schedule I under the Controlled Substances Act (CSA) pursuant to the temporary scheduling provisions of 21 USC 811 (h). These substances are PB-22 (aka QUPIC) [Quinolin -8-yl 1-pentyl-1H-indole-3-carboxylate], 5-fluoro-PB-22 [Quinolin-8-yl 1-(5-fluoropentyl)-1H-indole-3-caboxylate], AB-FUBINACA [N-(1-amino-2-methyl-1-oxbutan-2-yl)-1-(4-fluorobenzyl)-1H-indazole-3-carboxamide], and ADB-PINACA, [N-(1-amino-3,3-dimethyl-1-oxobutan-2-yl)-1-pentyl-1H-indazole-3-carboxamide]. These actions were based on findings by the Administrator and Deputy Administrator of the Drug Enforcement Administration that the placement of these synthetic cannabinoids into Schedule I of the CSA is necessary to avoid an imminent hazard to public safety. As a result of these orders, the full effect of the CSA and its implementing regulations including criminal, civil and administrative penalties, sanctions and regulatory controls of Schedule I substances, will be imposed on the manufacture, distribution, possession, importation, and exportation of these synthetic cannabinoids.

2. "Spice," "Potpourri," and "Herbal Incense" are slang terms used herein to describe smoke-able synthetic cannabinoids (SSC). In recent years, individuals began to manufacture and traffic in (SSC) products. Originally, these products were known on the street as "Spice" or "K2," which were the two past popular brand names for these products. Smoke-able synthetic cannabinoid products are a mixture of an organic "carrier" medium, such as the herb-like

substance Damiana leaf and/or marshmallow leaf, which is then typically sprayed or mixed with a synthetic cannabinoid chemical compound and mimics the pharmacological effect of a Schedule I or II controlled substance. This organic "carrier" and chemical mixture is then commonly sprayed with a tobacco flavoring, such as strawberry, blueberry, or grape, in order to mask the harsh chemical taste upon ingestion. Currently, there are hundreds of synthetic cannabinoid compounds. As mentioned above, the original five most common of these compounds, JWH-018; JWH-073; JWH-200; CP-47, 497 C8 homologue; and 47, 497 cannabicyclohexanol were "emergency scheduled" by the DEA in March 2011. In response, clandestine manufacturers and traffickers began distributing smoke-able synthetic cannabinoid products containing slightly varied synthetic cannabinoid compounds in an attempt to circumvent newly enacted federal and state laws, which banned or scheduled compounds, like those mentioned above. Investigations throughout the United States have revealed that, throughout 2010 and early 2011, manufacturers of SSC products commonly utilized the research chemical JWH-018 to manufacture SSC products. As a result of the temporary scheduling of JWH-018 by the DEA on March 01, 2011, almost all "Spice" manufactures began to utilize the research chemical AM-2201 as a "replacement" chemical in the manufacturing of their SSC products. At this time, many of these "Spice" manufacturers began to re-label their products as either "Potpourri" or "Herbal Incense" and as "not containing JWH-018." Almost universally, these products were fictitiously labeled "not for human consumption."

As mentioned above, AM-2201 was identified by DEA in May 2011 as an analogue of JWH-018 and, on July 09, 2012, AM-2201 was scheduled as a Schedule I Controlled Substance. In January of 2012, the first version of S. 3187, the Synthetic Drug Abuse Prevention Act of 2012 was disseminated to the public identifying the pending scheduling of AM-2201 as a Schedule I controlled substance. As a result of this information, the majority of "Spice" manufacturers shifted/chemical hopped to the chemicals UR-144 and 5FUR-144 (aka XLR11) as a replacement chemical in the manufacturing of their SSC products. At this time, the overwhelming majority of manufacturers now labeled their products "Potpourri" or "Herbal Incense" due to the negative publicity related to "Spice" and now as not containing "JWH-018 or AM-2201". SA Henry related that, based upon his training and experience, and understanding of these types of investigations, SA Henry believes that manufacturers of SSC products monitor legislation that bans or schedules certain chemicals and thereafter finds substantially similar replacement chemicals, which are not yet scheduled, like UR-144 and XLR11. In late 2012 and early 2013, based upon the DEA announcement that DEA intended to emergency schedule UR-144 and XLR-11, investigations and seizures of SSC products throughout the United States revealed that the use of UR-144 and XLR-11 was being discontinued and lab analyses documented that SSC products were now being manufactured with the replacement chemicals PB-22, 5-Flouro-PB-22, AB-FUBINACA, and ADB-PINACA. During this time, SA Henry observed that the chemical websites such as "Cayman Chemicals," "The

Happy Chemist," and "Alibaba" began to advertise PB-22, 5-Flouro-PB-22, AB-FUBINACA, and ADB-PINACA as substantially similar replacement synthetic cannabinoids for UR-144 and XLR-11.

　　　　　3.　Smoke-able synthetic cannabinoid products are commonly

purchased in head shops, tobacco shops, gas stations, convenience stores, adult stores and over the Internet.　As stated above, they are most often marketed as "incense" and/or "potpourri", and almost always carry the markings "not for human consumption."　Recently, SA Henry began to see the products carry the markings, "not for sale to minors", and "contains no analogue chemicals." These markings are routinely in place in an attempt to circumvent the product being identified as a controlled substance analogue of the newly controlled synthetic cannabinoids, as well as to avoid being classified as a drug, and therefore subject to the Federal Food and Drug Administration (FDA) testing and approval process. SA Henry reviewed literature regarding the effects of SSC products, conducted interviews with individuals who have used SSC products, and spoke with other agents regarding their interviews of SSC product users.　Based on this information, SA Henry advised me that users of these products reported some effects similar to marijuana, but more often these effects are much greater than the effects of marijuana, to include, paranoia, panic attacks, nausea, increased heart rate and increased blood pressure.　In some cases, use of these smoke-able synthetic cannabinoids led to serious psychotic hallucinations--- some of which can last for days.　It also appears that these products may be stored in the body for long

periods of time.  Therefore, the long-term effects on the human body are not fully known.  Unlike marijuana, there are many documented accounts where individuals who ingested SSC products either overdosed and were hospitalized or died as a result of their use of the SSC product.  Manufacturers of these products are not regulated and are often unknown since these products are purchased via the internet whether wholesale or retail.  More importantly, unlike marijuana, the chemical composition of these SSC's can vary greatly from one manufacturing cycle to the next.  These products are manufactured specifically for "human consumption" with the intent of getting the user "high".  During SA Henry and other agents' investigations, the use and sale of "Spice" is conducted utilizing the "lingo" of smoke shops.  Retailers of SSC products do not tell a customer the specific chemical or pharmacological effect received when utilizing a specific SSC product.  However, the sales of SSC products utilize coded terminology such as, "this product is "stronger" than that one."   While distributors/salesman will intentionally deny and disguise the use of the SSC product, i.e. for human consumption, these stores commonly sell the glass paraphernalia needed to smoke the SSC products in conjunction with the sale of the products.  No known legitimate use for these SSC products has been identified in this or any other DEA investigation related to the manufacture/distribution of SSC products.

4.  Based upon the Lane case and several other federal controlled substance or synthetic drug investigations conducted by SA Henry, SA Henry advised me of the following:

12

a. SA Henry learned from U.S. Customs seizures, emails, and cooperating individuals, whom SA Henry was able to independently corroborate and deemed to be credible and reliable, that chemical companies in China manufacture and distribute these designer drugs or controlled substance analogues.

b. SA Henry learned from these U.S. Customs seizures, emails, and cooperating individuals that these chemical suppliers in China will intentionally mislabel parcels shipped to the United States in an effort to ensure the parcel passes through Customs inspection. Specifically, SA Henry learned from these U.S. Customs seizures, emails, and cooperators that the labels on parcels containing analogues would falsely indicate that it contained one particular substance, when it in fact contained an analogue, in order to avoid being seized by Customs.

c. Specifically, SA Henry learned from reviewing emails, labels, and parcels seized analogues shipped from China would be mislabeled as containing common substances, like sodium dodecyl sulfate, sodium bicarbonate, carpet deodorizer, shoes, etc.

d. SA Henry found that with respect to the parcels containing analogues from China that the parcels were often shipped via EMS, just like the **SUBJECT PARCEL**.

**CHEMICAL STRUCTURAL SIMILARITIES AND THE SUBSTANTIALLY SIMILAR PHARMACOLOGICAL EFFECTS ON THE CENTRAL NERVOUS SYSTEM OF ANALOGUE SUBSTANCES - "ANALOGUE STATUS"**

5.    During the course of the Lane investigation, SA Henry attended a conference on the investigation and prosecution of analogue controlled substances; communicated with individuals knowledgeable on this subject matter, to include DEA Chemists and Pharmacists of the DEA Drug and Chemical Evaluation Section; reviewed materials from the Drug Enforcement Administration, Drug and Chemical Evaluation Section; and spoke with other law enforcement officers, prosecutors and chemists involved in such investigations and learned, in substance, the following:[1]

   i.   α-PVP (alpha-Pyrrolidinopentiophenone): Pursuant to laboratory analysis, the substance α-PVP has been found in some of the chemical compounds as referenced below.    In documentation dated

---

[1]    SA Henry told me that during the Lane case the defense attacked, among other matters, DEA's expert witnesses, to include the process by which DEA determined and DEA's ultimate determination that substances, like a-PVP, were analogues of or "substantially similar" to the Schedule I controlled substances, like MDPV.    SA Henry also advised me that the defense called its own expert witnesses in this regard.

SA Henry told me the Court allowed both DEA and defense experts to offer their respective opinions during the Lane trial, but that Lane was found guilty by a jury after receiving all of the evidence in that case.

As mentioned below, this trial information included evidence related to other EMS and international parcels that contained analogues shipped from China to Arizona.    As mentioned below, SA Henry told me that those parcels from the Lane trial are similar the **SUBJECT PARCEL**.

December 2011, the DEA, Drug and Chemical Evaluation Section, has determined that α-PVP is substantially similar in chemical structure to the Schedule I controlled substance MDPV.  DEA has also determined that based on structure activity relations, α-PVP is likely to have pharmacological effects on the central nervous system that are substantially similar to that of the Schedule 1 controlled substance; MDPV.  As described above, in March 2014, α-PVP was temporarily scheduled as a Schedule I controlled substance.

ii.  **4-MEC (4- Methyl-N-Ethylcathinone):** Pursuant to laboratory analysis, the substance **4-MEC** has been found in some of the chemical compounds as referenced below.   In documentation dated May 2011, the DEA, Drug and Chemical Evaluation Section, has determined that **4- MEC** is substantially similar in chemical structure to the Schedule I controlled substance Methcathinone. DEA has also determined that based on the structure activity relations, **4-MEC** is likely to have pharmacological effects on the central nervous

system that are substantially similar to that of the Schedule I controlled substance Methcathinone. As described above, in March 2014, **4-MEC** was temporarily scheduled as a Schedule I controlled substance.

iii. **5-Fluoro-UR-144; XLR 11** [1-9(5-flouro-pentyl))-3-((2,2,3,3-tetramethyycyclopropoyl))indole]:

Pursuant to laboratory analysis, the substance **5-fluoro-UR-144; XLR 11** has been found in some of the chemical compounds as referenced below. In documentation dated May 2012, the DEA, Drug and Chemical Evaluation Section, has determined that **5-fluoro-UR-144; XLR 11** shares chemical structural similarities with the Schedule I controlled substance, JWH–018. DEA has also determined that based on the structure activity relations, **5-fluoro-UR-144; XLR 11** is likely to have pharmacological effects on the central nervous system that are substantially similar to that of the Schedule I controlled substance, JWH–018. As described above, on May 16, 2013, **5-fluoro-**

**UR-144; XLR 11** was temporarily scheduled as a Schedule I Controlled Substance.

iv. **PB-22; QUPIC** (Quinolin -8-yl 1-pentyl-1H-indole-3-carboxylate): Pursuant to laboratory analysis, the substance **PB-22; QUPIC** has been found in some of the chemical compounds as referenced below. In documentation dated May 2013, the DEA, Drug and Chemical Evaluation Section, has determined that **PB-22; QUPIC** shares chemical structural similarities with the Schedule I controlled substance JWH-018. DEA has also determined that based on the structure activity relations, **PB-22; QUPIC** is likely to have pharmacological effects on the central nervous system that are substantially similar to that of the Schedule I controlled substance, JWH-018. As described above, on February 10, 2014, **PB-22; QUPIC** was temporarily scheduled as a Schedule I controlled substance.

v. **5-Fluoro-PB-22**[Quinolin-8-yl-1-(5-fluoropentyl)-1H-indole-3-caboxylate]: Pursuant to laboratory analysis, the substance **5-Fluoro-PB-22** has been

found in some of the chemical compounds as referenced below. In documentation dated May 2013, the DEA, Drug and Chemical Evaluation Section, has determined that 5-Fluoro-PB-22 shares chemical structural similarities with the Schedule I controlled substance AM-2201. DEA has also determined that based on the structure activity relations, 5-Fluoro-PB-22 is likely to have pharmacological effects on the central nervous system that are substantially similar to that of the Schedule I controlled substance; AM-2201. As described above, on February 10, 2014, 5-Fluoro-PB-22 was temporarily scheduled as a Schedule I controlled substance.

vi. **FUB-PB-22** [Quinolin-8-yl-1-(5-fluoropentyl)-1H-indole-3-carboxylate]: Pursuant to laboratory analysis, the substance **FUB-PB-22** has been found in some of the chemical compounds as referenced below. In documentation dated May 2014, the DEA, Drug and Chemical Evaluation Section, has determined that **FUB-PB-22** shares chemical structural similarities with the Schedule I

controlled substance 5-Fluoro-PB-22. DEA has also determined that based on the structure activity relations, **FUB-PB-22** is likely to have pharmacological effects on the central nervous system that are substantially similar to that of the Schedule I controlled substance; **5-Fluoro-PB-22**.

vii. **AB-CHIMINACA** [N-(1-Amino-3-methyl-1-oxobutan-2-yl)-1-(cyclohexylmethyl)-1H-indazole-3-carboxamide]: Pursuant to laboratory analysis, the substance **AB-CHIMINACA** has been found in some of the chemical compounds as referenced below. In documentation dated May 2014, the DEA, Drug and Chemical Evaluation Section, has determined that **AB-CHIMINACA** shares chemical structural similarities with the Schedule I controlled substance AB-FUBINACA. DEA has also determined that based on the structure activity relations, **AB-CHIMINACA** is likely to have pharmacological effects on the central nervous system that are substantially similar to that of the Schedule I controlled substance; AB-FUBINACA.

## UNITED STATES POSTAL INSPECTION SERVICE INFORMATION

6.   Based on my training and experience, I am aware that the United States Postal Service ("USPS") mail system is frequently used to transport controlled substances and/or the proceeds from the sales of controlled substances to areas throughout the United States.  I also know that drug traffickers prefer mail/delivery services such as Express Mail and Priority Mail because of the reliability and the ability to track the article's progress to the intended delivery point.     Additionally, International Express Mail Services offer similar conveniences as that of USPS Express Mail services.

7.   From my training and experience, I know that drug traffickers prefer domestic overnight/next–day delivery services such as the USPS Express Mail service and a quicker, more reliable international service such as International Express Mail service with USPS tracking numbers.  USPS Express Mail and International Express Mail are preferred because of speed, reliability, and the ability to track the mailed article's progress to the intended delivery point.

8.   Based on my training and experience regarding the use of USPS Express Mail, International Express Mail and Priority Mail for the transportation of controlled substances or the proceeds from the sale of controlled substances, I know these types of mailings usually bear the following characteristics:

> a.  The package is larger or heavier than a typical Express Mail mailing, often weighing less than 8 ounces; or larger

or heavier than the typical Priority Mail mailings, often weighing more than two pounds.

b. The Express Mail or Priority Mail package has a label with handwritten address information and is addressed from one individual to another.

c. The package either: (a) was destined for an area known to be a frequent destination point for controlled substances, having been mailed from an area known to be a source area for controlled substances; or (b) originated from an area known to be a frequent origination point for the proceeds from the sales of controlled substances, having been mailed to an area known to be a destination area for the proceeds from the sales of controlled substances.

9.     USPS Express, International Express and Priority mailings found to bear some or all of the characteristics described above are further scrutinized by inspectors. Address verifications are conducted and the return addresses listed on the packages are often found to be fictitious, incomplete or the listed sender name is not associated to the return address.

10.   Based upon the information provided to me by SA Henry mentioned above, I believe that the information contained in Paragraphs 7-10 above would apply to not only controlled substance cases, but also to controlled substance analogues cases where international mail is used, like EMS and the **SUBJECT**

PARCEL.

## INVESTIGATIVE DETAILS AND PRIOR SUBJECT PARCELS

11.  On August 7, 2014, I was contacted by SA Henry.  SA Henry advised me of an ongoing investigation he was conducting into the "Spice"/"Bath Salt" manufacturing activities of Geoff Turner (TURNER) since October 2012.

12.  SA Henry advised that based on information learned during his investigation, SA Henry identified TURNER as a large scale synthetics manufacturer/distributor in the greater Phoenix, AZ area. SA Henry stated that SA Henry has cultivated several reliable confidential sources and sources of information who provided information related to TURNER's synthetic activities, much of which SA Henry has corroborated.

13.  SA Henry told me that SA Henry seized products manufactured by TURNER that have been analyzed by the DEA Southwest Laboratory and found to contain a-PVP, 4-MEC, XLR11, PB-22, FUB-PB-22, AB-Chiminaca, and 5-Fluoro-AMB.  As mentioned above, SA Henry told me that all of these chemicals are either temporarily schedule I controlled substances or have been determined by DEA's Drug and Chemical Evaluation Section mentioned above to be analogues of schedule I controlled substances.

14.  During his investigation, SA Henry learned TURNER is using the address of 1601 W. Apache Trail, which is the recipient address on **SUBJECT PARCEL,** to drop ship parcels to Arizona via International Express Mail that contain synthetic cannabinoids and synthetic cathinones purchased by TURNER

from sources of supply in China that TURNER is utilizing to manufacture "Spice/Bath Salts." SA Henry stated that a confidential source, who is aware of TURNER's manufacturing activities and who has had numerous conversations with TURNER related to TURNER's illicit synthetics distribution, was approached by TURNER. TURNER asked the confidential source to allow TURNER to drop ship parcels to 1601 W. Apache Trail, which is the recipient address on **SUBJECT PARCEL**.

15.   As mentioned above, the name "Monte" at 1601 W. Apache Trail, Apache Junction, AZ 85120, is the recipient of the **SUBJECT PARCEL** from China. According to SA Henry, SA Henry has found no one named "Monte" to work at the business located at 1601 W. Apache Trail. Moreover, according to SA Henry the business complex at 1601 W. Apache Trail has multiple businesses located there. Despite the fact that SA Henry told me that there are multiple addresses there, there is no suite or unit number associated with the address on the label for the **SUBJECT PARCEL**. Based upon my training, experience, and understanding of this investigation, I believe that the **SUBJECT PARCEL** contains controlled substance analogues because individuals involved in the shipping and distributing controlled substances and controlled substance analogues often place fictitious names and incomplete recipient information on parcels, similar to the information contained on the label for the **SUBJECT PARCEL**, to avoid law enforcement detection.

16.   During the course of this investigation, I reviewed U.S. Postal Service records and learned that, in the past two weeks, two other parcels arrived at 1601 W. Apache Trail, which is the same recipient address as the **SUBJECT PARCEL.**   These prior parcels were also addressed to "Monte" at 1601 W. Apache Trail and were later retrieved by TURNER.  No contact telephone number was assigned to these prior parcels.  Based upon my training, experience, and understanding of this investigation, I believe that individuals involved in the shipping and distributing controlled substances and controlled substance analogues often do not place telephonic contact information on parcels in an effort to avoid law enforcement detection.

17.  Based on this information, the U.S. Post Office assigned to delivering mail and parcels to the 1601 W. Apache Trail, Apache Junction, AZ 85120, was notified by the Inspection Service to watch out for parcels matching the above mentioned characteristics.

18.  On August 12, 2014, I was notified by the Apache Junction post office supervisor of the **SUBJECT PARCEL's** arrival.  I was advised that **SUBJECT PARCEL** was an International Express from China and it was addressed to "Monte, 1601 W. Apache Trail, Apache Junction, AZ 85120."  I requested the **SUBJECT PARCEL** be held pending our response to retrieve the parcel.  On August 12, 2014, USPIS TFO Dawn Haynes of Mesa PD retrieved the **SUBJECT PARCEL** from the Apache Junction post office.

19.   Upon a physical examination of the **SUBJECT PARCEL,** it met all of the characteristics as described by SA Henry mentioned above relative to other parcels seized in his investigations which contained or involved controlled substance analogues.   I provided SA Henry with a photocopy of the International Express Mail label.   According to SA Henry, the **SUBJECT PARCEL** is labeled as containing sodium dodecyl sulfate, which SA Henry told me is an organic compound commonly used in cleaning and hygiene products.

20.   A database query was conducted in Clear, which is a database available to law enforcement, on the names and addresses written on the International Express Mail label for the **SUBJECT PARCEL.**   Due to the return address being from Shanghai, China, and that no name or business was provided with the return address, I was unable to obtain any relevant information. The database query revealed that the recipient address for the **SUBJECT PARCEL** was a deliverable address, but that "Monte" was not associated to 1601 W. Apache Trail, Apache Junction, AZ 85120.

21.   As mentioned above, based on my training, experience, and understanding of this investigation, I am aware that narcotics traffickers will use fictitious names in order to distance themselves from the narcotics and have deniability when receiving such items in the mail.

22.  Due to the information received from DEA in regards to an investigation involving the sale, manufacture, and distribution of "Spice/Bath Salts," the **SUBJECT PARCEL** was not presented for inspection by a trained

25

narcotics-detecting canine. That is, SA Henry learned during the Lane trial the drug detecting K9s are not trained to alert to analogues. Similarly, based upon information provided to me by drug detecting K9 Handlers/Officers, trained narcotics-detecting K9 indicate the presence of narcotics or a controlled substances as well as currency, notes, documents, or evidence bearing the presence of the odors of heroin, cocaine, marijuana and/or methamphetamine. They are not, however, yet trained to detect the presence of "Spice/Bath Salts" or controlled substance analogues.

23.    Based on these facts, I believe there is probable cause to believe that the **SUBJECT PARCEL** described in paragraph four contains controlled substances constituting evidence of violations of Title 21, United States Code, Sections 841(a)(1), 802(32), and 813 (Possession with intent to Distribute a Controlled Substance Analogue); and Title 21, United States Code, Section 843(b), Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance Analogue.

JEFFREY C. AGSTER
United States Postal Inspector

Subscribed and sworn to before me on this 20th day of August, 2014.

HONORABLE MICHELLE H. BURNS
United States Magistrate Judge

26